2011 WY 126

**Steve B. GLENN, Appellant (Plaintiff),**

v.

**UNION PACIFIC RAILROAD COMPANY, a Delaware Corporation, Appellee (Defendant).**

No. S–10–0197.

Supreme Court of Wyoming.

Sept. 9, 2011.

179

Representing Appellant: Frederick J. Harrison, Frederick J. Harrison, PC, Rawlins, Wyoming; Robert T. Moxley, Robert T. Moxley, PC, Cheyenne, Wyoming. Argument by Mr. Harrison.

Representing Appellee: Mark C. Hansen, Union Pacific Railroad Company; George E. Lemich, Lemich Law Center. Argument by Mr. Hansen.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

BURKE, Justice.

[¶ 1]   This case comes before us a second time.  Previously, we reversed a grant of summary judgment in favor of Union Pacific after finding that the railroad had a duty to exercise ordinary and reasonable care in the operation of its railway.[1]  After remand, the jury determined that both parties, as well as two non-party actors, were negligent and awarded damages to Mr. Glenn.  Mr. Glenn appeals, contending that the district court erred in refusing to admit evidence of a prior incident involving Union Pacific that was the catalyst for a change in his employer's safety procedures.  We conclude that the district court abused its discretion in excluding evidence of the prior incident and that the error was prejudicial to Mr. Glenn.  As a result, we reverse and remand for a new trial.

---

1.  *Glenn v. Union Pac. R.R. Co.*, 2008 WY 16, 176     P.3d 640 (Wyo.2008).

## ISSUES

[¶ 2]   Mr. Glenn presents the following issues:

1. Did the trial court err in excluding evidence of a "near-miss" at the tipple that occurred two weeks before Glenn's accident, even after the Railroad "opened the door"?

2. Did the trial court err in refusing Glenn's proposed instruction about intervening and supervening cause and permitting the jury to consider the fault of two nonparty actors?

3. Should the doctrine of cumulative error be applied in this case?

Union Pacific phrases the issues in a substantially similar manner.

## FACTS

[¶ 3]   Mr. Glenn was employed as a blaster at the Black Butte coal mine in Sweetwater County.  On June 30, 2000, he went to work expecting to weigh semi-trucks as they left the mine, but when he started his shift, the mine production superintendent asked him to attend to a problem with a Union Pacific train that was waiting to be loaded.  The train consisted of 102 rail cars that unloaded through dump doors in the floors of the cars.  When the train arrived at Black Butte, however, the dump doors on approximately 40 of the cars were either open or unlocked.  As the train could not be loaded with open dump doors, and closed but unlocked doors created a risk of derailment, the dump doors needed to be closed and securely locked before the train was loaded.

[¶ 4]   The production superintendent dropped Mr. Glenn off near the tracks, where a coworker was waiting with the conductor of the train.  At this point, the train was parked on the balloon track, an oval-shaped section of track situated just ahead of the tipple, which is the structure used to load coal into the train cars.  The production superintendent instructed Mr. Glenn and his coworker to check the train cars by walking the length of the balloon track, also referred to as the "loop."  The conductor told Mr.

Glenn and his coworker that he would cause the train to be pulled up, so that they could close the dump doors on the paved area near the tipple, which accommodated five or six train cars at a time.  However, due to an incident that occurred less than two weeks earlier, Black Butte had changed its car-checking procedure to require its employees to check the cars while the train remained stationary.[2]  The previous incident, which is at the heart of this appeal, occurred while Black Butte employees were engaged in the same activity of checking the train cars to see that they were properly locked before loading the Black Butte coal.

[¶ 5]   At the time of the previous incident, Black Butte's safety procedures required that all cars be inspected at the tipple.  An employee in the tipple would be able to observe the interior of the cars for residue that might come out when the doors were opened, and the employees closing and locking the cars would do so on the paved area around the tipple.  After the cars were checked, the train would move ahead so that additional cars could be inspected at the tipple.  Cleav Porter was a mine employee engaged in this inspection process.  For reasons that are unclear from the record, he was underneath a Union Pacific train in the tipple area when it unexpectedly moved forward.  Fortunately, Mr. Porter was not injured, but he was very upset about the close call.

[¶ 6]   As a result of this incident, the mine issued a letter on June 27, 2000 changing the inspection procedure.  The letter, which was authored by the same production superintendent who had instructed Mr. Glenn to check the cars by walking the loop, provided as follows:

In light of the recent incident in checking the train, the following process will be followed when checking and closing rail car doors.

The train[ ] will not be checked when it is moving.  Instead, as the train is backing in, cars with open doors will be noted.

Then the train will be parked and the brakes will be set.  The crew will then get

---

**2.**   There is some dispute as to whether the new car-checking procedure required employees to

check the cars by walking the balloon track.  See discussion *infra,* at ¶ 15.

off the train while Black Butte personnel close doors and check the units for loading. When all checks have been made and all doors are closed the train crew can start loading.

Until we can come up with a process to check trains that insures that we will not compromise the safety of our people while checking the cars, we will follow this procedure.

Your help on this matter is greatly appreciated.

[¶ 7] In accordance with Black Butte's new car-checking procedure and the production superintendent's instructions, Mr. Glenn and his coworker informed the train conductor that they would be checking the cars by walking the loop. Mr. Glenn had never before closed dump doors. His coworker showed him what to do. Using a pry bar, the two first opened the doors and then swung them closed again to engage the locking mechanism. After opening and closing several dump doors, Mr. Glenn and his coworker discovered that some of the rail cars contained coking coal, which was subsequently determined to have been left in the train after it was unloaded at a facility owned by FMC Astaris in Don, Idaho. When Mr. Glenn opened the unlocked doors of one of the cars, a substantial amount of coking coal fell out and trapped his leg so that, as he fell backward, his right leg was broken.

[¶ 8] Mr. Glenn filed suit claiming that his injury was caused by Union Pacific's negligence. Union Pacific denied negligence and asserted that Mr. Glenn, Black Butte, and FMC Astaris were at fault for the accident. Prior to trial, Union Pacific filed a motion in limine seeking to prevent the jury from hearing any evidence regarding the Cleav Porter incident. Union Pacific asserted in its written motion that the evidence was irrelevant and that, even if the evidence was determined to be relevant, it should still be excluded because the probative value of the evidence was outweighed by the danger of unfair prejudice. Mr. Glenn resisted the motion and asserted in his written response that the evidence was relevant, in part, because the incident was "a primary reason that Steve Glenn came to be where he was,

doing what he was doing, when he was injured."

[¶ 9] The district court considered Union Pacific's motion at a hearing held on June 23, 2009. At the hearing, Union Pacific argued that evidence of the prior incident was not "in any way relevant to the Glenn incident." Union Pacific contended that Mr. Glenn was offering the evidence "to show that the railroad is negligent, they don't pay any attention to their rules, for a number of different reasons." The district court agreed that the evidence could not be admitted to prove that Union Pacific was negligent, but stated that the evidence could be admitted if Union Pacific argued that Black Butte should not have allowed its employees to inspect incoming trains on the balloon track. In a written order memorializing the ruling made at the hearing, the court granted Union Pacific's motion in limine to exclude "Any argument, evidence, or reference to a purported 'near miss' regarding Cleav Porter which occurred prior to Mr. Glenn's accident." In accordance with the district court's ruling, the letter changing Black Butte's car-checking procedure was redacted to eliminate the first sentence referring to the "recent incident in checking the train" before the letter was admitted into evidence.

[¶ 10] In their Joint Statement, the parties stipulated that the balloon track at Black Butte was not a safe workplace for Mr. Glenn to close, latch, and lock the coal car doors. At several junctures during trial, Mr. Glenn attempted to introduce evidence of the prior incident in response to argument and testimony that the balloon track was not a safe area in which to check the train cars. Each attempt to do so, however, was rebuffed by the district court, which held that the evidence was irrelevant and prejudicial to Union Pacific.

[¶ 11] A jury verdict was ultimately entered in Mr. Glenn's favor. However, in the ensuing judgment, the total damage award was significantly reduced by the percentage of fault attributed to other actors. The jury apportioned 70% of the fault to non-party Black Butte, 20% to Union Pacific, 5% to non-party FMC Astaris, and 5% to Mr. Glenn. Mr. Glenn appeals, claiming that the

district court's refusal to admit evidence of the prior incident was prejudicial error. He also contends the district court erred in allowing Astaris to be listed as an actor on the verdict form, and in refusing to give the jury an "intervening cause" instruction.

## STANDARD OF REVIEW

[¶ 12] We review a trial court's evidentiary decisions for an abuse of discretion. Rulings on the admission of evidence are placed within the sound discretion of the trial court and, in order to challenge these rulings successfully on appeal, an appellant must show that the trial court committed a clear abuse of discretion. *Schmid v. Schmid*, 2007 WY 148, ¶ 10, 166 P.3d 1285, 1288 (Wyo. 2007).

> A trial court's rulings on the admissibility of evidence are entitled to considerable deference, and, as long as there exists a legitimate basis for the trial court's ruling, that ruling will not be disturbed on appeal. The appellant bears the burden of showing an abuse of discretion. Even when a trial court errs in an evidentiary ruling, we reverse only if the error was prejudicial. The appellant must show a reasonable probability that, without the error, the verdict might have been different.

*Id.* (citation omitted).

## DISCUSSION

[¶ 13] Mr. Glenn argues that the district court abused its discretion in refusing to admit evidence of the prior incident at Black Butte. He challenges the court's initial ruling granting Union Pacific's motion in limine, and also contends that the court erred in refusing to admit the evidence after Union Pacific repeatedly "opened the door" by arguing that the balloon track was not a safe place to check the train cars. Mr. Glenn argues that, due to the fact that Black Butte was immune from suit, the district court's decision to exclude the evidence was prejudicial because it impeded his ability to defend Black Butte against Union Pacific's allegations of negligence. According to Mr. Glenn, he should have been allowed to introduce the prior incident in order to rebut evidence

indicating that Black Butte was at fault for his injury.

[¶ 14] Union Pacific argues that the district court did not abuse its discretion because the prior incident was not relevant under W.R.E. 401. It argues that the relevant inquiry was whether Black Butte's car-checking procedure was reasonably safe or not reasonably safe, and that this determination is unrelated to the fact that Black Butte's policy was changed in response to the prior incident. Union Pacific also argues that it did not "open the door" to introduction of the prior incident. Finally, Union Pacific contends that, even if the evidence was relevant, the district court properly excluded the evidence under W.R.E. 403 because the probative value of the evidence was outweighed by the danger of unfair prejudice.

### Black Butte's Car–Checking Procedure

[¶ 15] Before we address the parties' main contentions, we must address a factual issue raised by Union Pacific. On appeal, Union Pacific contends that "the new Black Butte car checking procedure, in effect at the time of [ ] Glenn's accident, dictated that Black Butte employees should do the car checking job at the tipple, not on the balloon track." Further, Union Pacific argues that "The testimony at trial established that Glenn was working on the balloon track because [the production superintendent] ordered him to do so, in clear violation of the Black Butte car checking procedure." There was substantial testimony presented at trial, however, indicating that Black Butte intended for its employees to check the cars on the balloon track, although that testimony was not entirely consistent. The production superintendent, who had authored the new procedure and who had instructed Mr. Glenn to walk the loop, was less than perfectly clear about its intended execution in his testimony at trial. During direct examination by counsel for Union Pacific, he testified as follows:

> COUNSEL: Where in this policy does it tell the employees that they should either do this job, that is the car checking job, at the tipple or on the loop?
> WITNESS: It doesn't.

COUNSEL: Should it say that? Should it tell the employees that I don't want you doing it out on the loop because it's bad footing, I want you to do it up by ... the tipple where you have got a smooth flat area?

WITNESS: I think the point we are trying to make is not to do anything with a moving train or the possibilities of a moving train.

COUNSEL: But when you formulated this policy on June 27 did you intend to convey to the coal plant personnel that you wanted them to do this job, that is the job of checking the doors, and closing, latching and locking the doors up at the tipple?

WITNESS: No, it didn't specify at the tipple.

COUNSEL: I know you didn't specify at the tipple, but I guess what I'm asking is was that your intention, was that your thought that that is where I want them to do that?

WITNESS: I can't be sure. I think the intent was, like I said, that we didn't want to endanger employees with the possibility of a train moving through the checking process.

COUNSEL: Okay. That was the only idea you wanted to convey to the car checking crews?

WITNESS: Yes.

...

COUNSEL: So you didn't care one way or the other where the employees closed, latched and locked the doors?

WITNESS: I didn't say I didn't care. I just said our fear was we wanted to make sure they were safe around moving equipment. And they have to determine on their own if it is safe. Look at the environment you are working in, if there's obstructions or whatever. It's part of your hazard recognition to ensure you are going to be safe. There is nothing to say you can't slip in the tipple area either. But you have to make that determination on your own.

COUNSEL: So you left that up to the employees to determine where they were going to do the job of closing, latching and locking the doors?

WITNESS: Yes.

Later on in his testimony, however, the production superintendent indicated that the new procedure did require cars to be checked at the tipple:

COUNSEL: When you dropped off Mr. Glenn, did you assume that Mr. Glenn and [his co-employee] were going to do this job at the tipple?

WITNESS: I'm not sure the circumstances, whether the train didn't have a crew and it was parked there or if the crew was on board and they were going to pull through. I'm not clear right now the exact status of that train.

COUNSEL: But when you dropped Mr. Glenn off to do that job did you assume he was going to do that at the tipple pursuant—

WITNESS: That would have been my assumption, yes.

COUNSEL: Because that would have been pursuant to the policy and procedure?

WITNESS: Yes.

COUNSEL: Doing it out on the loop would have been contrary to the policy and procedure?

WITNESS: According to the process, yes.

The testimony of other witnesses, however, was less ambiguous. Mr. Glenn, the coworker who helped him check the cars, the drill and blaster superintendent on duty at the time of the accident, and the head mine superintendent on duty at the time of the accident all testified, in unequivocal terms, that the new procedure required Black Butte personnel to close the dump doors on the balloon track rather than exclusively at the tipple. In light of the testimony of these witnesses, and the apparently contradictory testimony of the production superintendent, we find sufficient evidence to support Mr. Glenn's contention that checking the train cars on the balloon track was consistent with Black Butte's new car-checking procedure.

*Issue 1: Admissibility of Prior Incident Evidence*

[¶ 16] In addressing Mr. Glenn's first claim of error, the issues we must resolve are (1) whether the reason for Black Butte's change in safety procedures is relevant, and (2) whether the district court abused its discretion in rejecting that evidence. Throughout the trial, Mr. Glenn sought to introduce evidence of the prior incident at Black Butte for several purposes, one of which was to counter Union Pacific's argument that Black Butte was negligent in requiring its employees to check incoming trains by walking the balloon track. Our review focuses on the admissibility of evidence of the prior incident for this purpose.

### a. *Relevance under W.R.E. 401*

[¶ 17] We begin our analysis by addressing the issue of whether the evidence was relevant. For evidence to be admissible, it must be relevant. W.R.E. 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." W.R.E. 401. This definition of relevance, which is identically expressed in Rule 401 of the Federal Rules of Evidence, "is generous and it distinctly favors broad admissibility." 1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 4.1, at 541 (3d ed.2007) (footnote omitted). According to Professors Mueller and Kirkpatrick,

> If evidence has only slight probative force, it may well be excludable, but the reason is not that it is irrelevant. Quite deliberately, Fed.R.Evid. 401 ignores suggestions that legal relevance means that each bit of proof should carry a "plus value" or should make the point or proposition sought to be proved more probable than not. Instead Fed R. Evid. 401 requires no more probative worth than that which reasonable persons would require in making thoughtful decisions in life outside the courtroom.

*Id.* (footnote omitted). Similarly, we have stated that "Generally speaking, '[t]he test of relevancy is one of reasonableness and common sense, liberally applied to favor admissibility rather than the exclusion of evidence.'" *Foster v. State*, 2010 WY 8, ¶ 20, 224 P.3d 1, 8 (Wyo.2010) (quoting *Callen v. State*, 2008 WY 107, ¶ 17, 192 P.3d 137, 144 (Wyo.2008)).

[¶ 18] Mr. Glenn contends the evidence of the prior incident was relevant because it tended to show "why Black Butte changed the car-checking procedure and why Glenn was out walking the loop." We agree that the incident is relevant because it provides a context for Black Butte's decision to change its car-checking procedure. As noted by Mueller and Kirkpatrick, "Circumstantial evidence that provides such background may be relevant if it throws other evidence into sharper relief, helps clarify or explain it, or makes it more vivid or real." *Id.* at 559. At the very least, the prior incident helps explain Black Butte's decision to change its car-checking procedure, which was made in direct response to the incident involving Mr. Porter. More fundamentally, however, the prior incident was relevant to the question of whether Black Butte's new car-checking procedure was more or less safe than its former procedure, or the procedure suggested by Union Pacific at trial. Black Butte's attempt to eliminate the risk of injury from a moving train by switching to a procedure that required the train to be stationary until all cars were checked tends to show that the procedure in place at the time of Mr. Glenn's accident was, in at least one respect, a safer alternative to the former procedure. The degree of safety of Black Butte's car-checking procedure had direct implications for the jury's determination as to Black Butte's degree of fault, one of the ultimate issues in this case. The evidence was relevant.

[¶ 19] The district court appears to have determined that, by stipulating to the fact that the balloon track was an unsafe place for Mr. Glenn to check the train cars, Mr. Glenn purged the prior incident of its potential relevance. During the hearing on Union Pacific's motion in limine, the court indicated that there was no need to explain why the cars were checked on the balloon track, as opposed to the tipple, in light of the stipulation:

The reason [Mr. Glenn] went out there is it was the policy of Black Butte at that point to walk the line, or whatever, walk the loop. He doesn't have to testify about why it's the policy unless—well, I guess since there is a stipulation that it wasn't a safe workplace it kind of covers it. Doesn't it?

The evidence of the prior incident, however, did not become irrelevant merely because Mr. Glenn admitted that the balloon track was not a safe place to check the train cars. First, as we have previously stated, "an evidentiary admission is not conclusive but is subject to contradiction or explanation." *Jewell v. Chrysler Corp.*, 994 P.2d 330, 335 (Wyo.1999) (quoting 2 *McCormick on Evidence* § 254, at 137–38 (5th ed. 1999)). Second, even if the stipulation had removed from consideration the issue of whether the balloon track was "safe," Mr. Glenn's admission does not answer the question of whether Black Butte's new car-checking procedure was more or less safe than other possible car-checking procedures. At trial, Union Pacific argued that all train cars should be checked near the tipple, where the footing was sound. This procedure necessarily required the train to be moved periodically during the inspection process. Black Butte's new procedure, however, eliminated the risk of injury from a moving train. The prior incident was relevant to a determination as to the degree to which Black Butte's procedure was safe or unsafe, and it was ultimately the jury's responsibility to factor that determination into its apportionment of fault. The stipulation that the balloon track was not a safe place to check the train cars did not render the prior incident irrelevant.

### b. Balance of probative value and danger of unfair prejudice under W.R.E. 403

[¶ 20] Next, we must answer the more difficult question of whether the district court abused its discretion in its application of W.R.E. 403. W.R.E. 403 provides that, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." As a general principle, we have stated that "This rule is to be used sparingly, because it excludes evidence which is concededly relevant and probative." *Mintun v. State*, 966 P.2d 954, 959 (Wyo. 1998) (citing *Towner v. State*, 685 P.2d 45, 49 (Wyo.1984)). Further, W.R.E. 403, by its terms, is "weighted in favor of admissibility, allowing evidence to come in unless prejudicial effect substantially outweighs probative worth." *Proffit v. State*, 2008 WY 114, ¶ 22, 193 P.3d 228, 237 (Wyo.2008) (quoting Christopher B. Mueller & Laird C. Kirkpatrick, 3 *Federal Evidence* § 6:42 (3d ed.2007)).

[¶ 21] Unfairly prejudicial evidence is evidence which will likely "stimulate an excessive emotion or ... awaken a fixed prejudice ... and thus dominate the mind of the [jury] and prevent a rational determination of the truth." *Furman v. Rural Elec. Co.*, 869 P.2d 136, 146 (Wyo.1994) (quoting 22 Wright & Graham, *Federal Practice and Procedure: Evidence* § 5215, at 278 (1978)). We have previously noted the importance of characterizing potential prejudice as "unfair" under Rule 403: "Rule 403 does not allow the exclusion of evidence simply because it is prejudicial. All of the evidence against appellant [is] 'prejudicial.' The evidence must be *unfairly* prejudicial before its prejudicial effect is weighed against its probative value." *Robinson v. State*, 716 P.2d 364, 367 n. 2 (Wyo. 1986) (emphasis in original); *see also Pena v. State*, 792 P.2d 1352, 1355 (Wyo.1990) ("For the prejudice factor to come into play the [trial] court must conclude that it is unfair."); *Heinemann v. State*, 12 P.3d 692, 702 (Wyo. 2000) ("Evidence that is not in some way prejudicial would be irrelevant, since the purpose of evidence is to persuade the trier of fact of the validity of the charge."). With these principles in mind, we turn to the district court's evaluation of probative value and unfair prejudice.

[¶ 22] As noted above, at the hearing on Union Pacific's motion in limine, the court determined that evidence of the prior incident should be excluded, but stated that its admissibility at trial would depend on whether Union Pacific "opened the door" to the evidence. The transcript from the hearing provides as follows:

THE COURT: Well, I can see where [the prior incident] would have some relevance if the argument is made that they shouldn't have sent him out to walk the track, that it's unsafe to do that. I don't know if the railroad is going to do that. But just to bring in that the railroad is dangerous and obviously it was dangerous then and so it's dangerous now, I can't see just saying it's not a big—it can come in on that basis. I could see where—depending on what the railroad does here, could see where it could come in on a limited basis maybe based on what Mr. Harrison just said.

COUNSEL FOR UNION PACIFIC: Your Honor, we are—we believe that this evidence is coming in for the purpose of, the railroad was negligent, didn't pay any attention to the rules, it was dangerous, they almost killed Cleav Porter, so let's get all riled up about the railroad. It doesn't have anything to do with Steve Glenn's accident.

The notice—if Mr. Porter's incident put the railroad on notice of anything it was, if you have somebody operating under the cars while the train is moving that can be dangerous. That doesn't have anything to do with this case, with the Glenn case. The cars were stationary. They weren't moving.

THE COURT: Okay. I have no problem granting your motion in regard to what you just said. But if the issue comes up about it being unsafe or why was Mr. Glenn out there, that Black Butte was negligent in making him go out there and having that policy of walking the loop and checking these cars, then at that point, I think that opens the door for it to come in.

COUNSEL FOR UNION PACIFIC: So that is the Court's ruling?

THE COURT: That is my ruling. Your motion in limine is granted except if you—it will be ungranted if you open the door on the basis of what I just said.

During a colloquy in the judge's chambers just prior to trial, the court again indicated that admissibility of the prior incident would depend on Union Pacific's arguments at trial:

THE COURT: I think U.P. has to be careful in how it handles that issue, but I am not interested in having the Cleav Porter incident in this trial unless U.P. puts me in a position where I have to let it in.

. . .

I think that is what I said before is I could foresee a possibility that U.P. could open the door, but I think I was sending a signal, don't open that door. I think that is what I was trying to say.

Based upon the district court's pretrial ruling, it was clear that evidence of the prior incident would not be allowed to prove that Union Pacific was negligent. It was also clear, however, that Union Pacific could open the door to admissibility of that evidence "if the issue comes up about it being unsafe or why was Mr. Glenn out there, that Black Butte was negligent in making him go out there and having that policy of walking the loop and checking these cars." Mr. Glenn contends that Union Pacific "opened the door" to receipt of the evidence and that the district court erred in excluding the evidence after Union Pacific had "opened the door." We agree.

[¶ 23] During opening statements, counsel for Union Pacific stated that Black Butte should not have allowed its employees to inspect train cars on the balloon track, and asserted that checking cars at the tipple was the safer alternative.

COUNSEL: . . . What [Black Butte] forgot to tell their employees is we want you checking the cars in this flat area, in this smooth area by the tipple. Again, I'm the tipple, the road crossing is here, nice, smooth, level area. Out here is the asphalt or concrete apron on either side of the track. That is where Black Butte wanted their employees to check the cars, but they didn't tell them that. This is an awful procedure. They didn't—Black Butte didn't tell their employees one of the critical aspects—two of the critical aspects of the procedure. Number one, get an operator up in the tipple. Number two, check the cars, and close, latch and lock the doors where it's safe. Not out on a balloon track.

There isn't going to be much, if any, dispute in this case about the fact that the balloon track is not a reasonably safe place to be closing, latching or locking doors. You have got a choice here. Nice smooth area here and here, or you go out on the balloon track where it's sloped, where you have got some of these coking briquettes, and it's a ballast shoulder. It's a rock shoulder. Which one is safer? It's obvious which one is safer and everyone is going to agree. It's so obvious we stipulated to it. That is not a reasonably safe place to work for Mr. Glenn. Black Butte knew that, but they didn't bother to convey that to their employees in this little procedure note.

Further, during Union Pacific's direct examination of Black Butte's production superintendent, counsel for Union Pacific elicited testimony regarding the relative safety of checking cars on the balloon track as opposed to at the tipple:

COUNSEL: Is it important out at the mine to provide employees with good footing when they are working?

WITNESS: Yes.

COUNSEL: Do you feel that's Black Butte's responsibility to provide its employees with a safe place to work?

WITNESS: Yes, it is.

COUNSEL: Is providing employees with good footing where they are working part of that responsibility to provide a safe place to work?

WITNESS: You do the best you can to provide safe conditions such as footing.

COUNSEL: I thought it was beyond doing the best you could. I thought there was an absolute mandatory duty that Black Butte had to provide its employees with a safe place to work.

WITNESS: Yes, you provide your employees the best conditions.

COUNSEL: The best conditions, working conditions, in the mining industry, I think I saw in one of the policy statements.

WITNESS: Yes.

COUNSEL: Would be the absolute safest workplace in the mining industry?

WITNESS: Yes.

COUNSEL: You don't want employees to be working in an area where they don't have good footing; is that right?

WITNESS: If there is not good footing we need to address the situation to make it as safe as possible. Sometimes you can't completely eliminate the hazard so you have to address it.

COUNSEL: And avoid it if you can't eliminate it?

WITNESS: Yes, that is one of the possibilities.

COUNSEL: We have got a stipulation in this case that the judge read to the jury in the beginning of the case and that stipulation is the balloon track at Black Butte was not a safe workplace for Mr. Glenn to close, latch and lock the coal car doors.

WITNESS: Okay.

COUNSEL: Would you agree with that?

WITNESS: It's not the most desirable location, that is for sure.

COUNSEL: The most desirable location is up at the tipple?

WITNESS: If I was going to perform that job that is where I would want to do it.

COUNSEL: Not out on the balloon track?

WITNESS: No.

COUNSEL: And the balloon track has— when you go out there you have got railroad ties and rails and then this loose rock ballast that slopes down, right?

WITNESS: Yes.

COUNSEL: That doesn't sound like ideal. That is not ideal footing conditions?

WITNESS: Not in my opinion.

COUNSEL: And there is—if you go out there there is product, there is coke and there is coal that is spilled from the cars mixed in with the ballast?

WITNESS: In some areas, yes.

COUNSEL: That would contribute to the bad footing conditions?

WITNESS: Yes, it would.

And again, during direct examination of Black Butte's safety supervisor at the time of Mr. Glenn's accident, counsel for Union Pacific elicited testimony relating to the footing

on the balloon track and the area surrounding the tipple.

COUNSEL: Did Mr. Glenn tell you where the accident happened?

WITNESS: No, I don't think Steve told me. [His coworker] told me. [His coworker] told me specifically where it happened.

COUNSEL: What did he tell you?

WITNESS: It was outside the tipple area headed west out on the rail loop.

COUNSEL: What was your reaction to that?

WITNESS: That surprised me.

COUNSEL: Why did that surprise you?

WITNESS: Well, we have this specifically built area with a nice concrete pad that provides a good footing. Where the accident occurred is out—actually out on the rail loop where there is poor footing and steep bank for the ballast.

COUNSEL: So you provided the Black Butte employees with a safe place to do that job and Mr. Glenn and [his coworker] had chosen an unsafe place to do it?

WITNESS: Yes.

. . .

COUNSEL: And they are in a dangerous workplace?

WITNESS: It's a tough place to even walk out on the railroad loop.

COUNSEL: Why is that, the railroad loop a tough place to work?

WITNESS: Just the steep edges of the ballast itself, the ballast material, the railroad ties. That is why the concrete pad was specifically built at the tipple. Nice, smooth, level area for that work to be performed.

COUNSEL: Is the ballast that we are talking about almost fist-sized rocks?

WITNESS: Yeah. Three inch, yeah.

COUNSEL: And to a certain extent if it's sloped like you said it is, as you walk on it it can shift and it's loose?

WITNESS: Sure.

COUNSEL: And it takes—does it make it very difficult to walk on that?

WITNESS: It's tough to walk, yeah. It's tough to walk along the rail.

COUNSEL: And you have known for a number of years prior to the day of the accident that walking on that steep, loose ballast wasn't safe?

WITNESS: Yes.

COUNSEL: Would it be something that would be obvious to somebody the minute they started walking on the ballast?

WITNESS: It would be instantly obvious.

COUNSEL: It would just scream at you?

WITNESS: Sure.

COUNSEL: And especially if you were at the tipple where you could see the concrete pad, it's smooth, it's level. Do you keep it clean?

WITNESS: That is what it was put there for, so you could get a bobcat in there for ease in keeping it clean. There is enough room in there to get a skid steer loader to help keep it clean, yes.

COUNSEL: So if you check the cars there and there was any spillage from carry-back material you could very easily clean it up?

WITNESS: Yes.

[¶ 24] Despite the district court's earlier warnings that evidence of the prior incident may be admissible if Union Pacific argued that "Black Butte was negligent in making him go out there and having that policy of walking the loop and checking these cars," the court determined that Union Pacific had not "opened the door" to that evidence. When counsel for Mr. Glenn sought to introduce testimony regarding the prior incident to defend against the argument that Black Butte was negligent, the court responded as follows:

THE COURT: You are saying they only had two choices? That is it? That is one of the issues that I have. I mean, the jurors—one of the jurors said it really well yesterday when he said that every rule is made for a reason and they are written in blood, basically. And we aren't looking at the reason for all of the rules, whether it be Black Butte, whether it be why UP has these rules, whether it be why anybody has a rule. We are not looking at the

reasons. We are dealing with the rules as they are.

There is a stipulation in this case that the balloon [track] was not a safe workplace. I think it's a question, then, of responsibility. Both of you have stipulated it's not a safe workplace. The issue that I have is, so the Cleav Porter incident happens and that alerts people there is this issue. So Black Butte changes its rule or its policy. Why didn't it change it to a safer policy? I think you are trying to convince me that there are only two rules, the one that was in effect before Cleav Porter and the one that they chose afterwards. Isn't there some middle ground? Like they should come up there and unload or check the cars at that safe place. Why didn't they have that rule? Or why didn't they do a rule that we will clean out an area on the balloon track and let these cars be checked there or pour some concrete so there is special footing?

. . .

They enacted another rule, it seems to me, that wasn't any better than the one they had before.

. . .

COUNSEL FOR MR. GLENN: We just want to show the jury why they did it.
THE COURT: Why aren't we showing them why they have all the other rules out there? Every rule has a reason.

. . .

COUNSEL FOR MR. GLENN: The reason why has to be part of the comparative fault because otherwise—I mean, if you ran out in the street because a semi is coming one way at you and another vehicle is coming another way and you have to make a quick decision, then all of that should be weighed into the facts. That is what we are saying, all of this information ought to be weighed into the facts, why they acted the way they acted. The jury is not knowing why they acted the way they acted.
THE COURT: They don't know why all the other rules are in effect either. I mean, all these rules that you guys are talking about. No. And on top of all of that, what I said is that there is a rele-

vance issue in my mind and the prejudice outweighs the probative value and that is where I'm at on it. I just—between the stipulation—

COUNSEL FOR MR. GLENN: I don't see how the stipulation estops us to warn—to demonstrate the facts. I mean, obviously we stipulate to facts to save time, but we—and obviously that was an unsafe situation. But obviously, the tipple itself was an unsafe situation because Union Pacific violated its red zone rules and almost killed Cleav Porter. But Union Pacific is telling this jury that it's Black Butte's fault that they are not using the tipple when, in fact, it's Union Pacific's fault that they are not using the tipple. And if you are comparing fault, the pot is calling the kettle black.

THE COURT: But I thought it had to be that the train was stopped. That that was the new rule, that it couldn't be checked until it was stopped. So why couldn't it have been periodically stopped? I don't know how big that flat area is. Why couldn't they have pulled up enough cars there—or they could have walked to the loop. Here is my solution. . . . Walk around it and see what needs to be fixed, closed and latched and locked and all of that and mark those cars or make a note. Then have the UP people pull them up to that safe area and stop the train.

COUNSEL FOR UNION PACIFIC: And do it there.

THE COURT: So we don't have another Cleav Porter incident.

COUNSEL FOR MR. GLENN: That is what they were doing with Cleav Porter. They knew where the cars were and the tipple was a short space. So the idea was they move a car, have Cleav Porter go underneath and close the doors. Then they would let him get out from under it, move the cars again, and he would go underneath and close them. Only he was underneath one of them and they moved the train.

THE COURT: Yes, I know it. I don't think the jury needs to hear that. I think it's inflammatory, it's prejudicial. The

facts are different from this case. I'm not letting it in. I think that Black Butte had a damn good reason for changing their rule, but they should have come up with a better one.

[¶ 25] The district court's refusal to admit evidence of the prior incident allowed Union Pacific to shift blame to Black Butte by producing testimony that its safety procedures were inadequate, but prevented Mr. Glenn from defending against those allegations by presenting the prior incident as the catalyst and justification for its change in procedure. Our precedent reflects a general reluctance to uphold evidentiary rulings which exclude evidence necessary to a party's defenses or theory of the case. For example, in *Capshaw v. WERCS*, 2001 WY 68, 28 P.3d 855 (Wyo.2001), a case involving an alleged breach of an employment contract, we addressed a challenge to the trial court's grant of a motion in limine, which prevented the plaintiff from arguing that his complaints relating to the defendant's mismanagement constituted the true motivation for his discharge. *Id.*, ¶ 4, 28 P.3d at 856–57. We held that the trial court abused its discretion in excluding the evidence because the ruling effectively prevented Mr. Capshaw from presenting his theory of the case to the jury. *Id.*, ¶ 10, 28 P.3d at 858. We noted that

> Mr. Capshaw clearly has the right to argue and attempt to persuade the jury that his criticism of management was in good faith and his discharge was in violation of his contract requiring good cause for termination. The only way he can succeed at trial is to convince the jury he had good reason for his criticism of management and problems did exist. "A party should be allowed an appropriate opportunity to present and develop that evidence relevant to that party's theory of the case." *Stauffer Chemical Company v. Curry*, 778 P.2d 1083, 1098 (Wyo.1989).

*Id.* Further, we noted the patent unfairness in the one-sided effect of the trial court's ruling:

> In addition, the precise language of the order granting the motion in limine appears to limit only Mr. Capshaw's presentation of his theory of pretextual discharge with no corollary effect on WERCS. Therefore, it has the unfortunate potential to permit WERCS to raise the mismanagement issue in its opening and evidentiary presentation in support of its counterclaim while restraining Mr. Capshaw from responding in kind. This circumstance alone raises concerns the order is arbitrary, capricious, and, hence, an abuse of discretion.

*Id.*, ¶ 11, 28 P.3d at 858.

[¶ 26] Likewise in *Schmid*, 166 P.3d 1285, a case involving a dispute relating to the plaintiff's salary bonus, we addressed a challenge to the trial court's decision to exclude the defendant's proposed witness testimony indicating that the defendant's agreement with the plaintiff employee was similar to an agreement he had with two other employees. *Id.*, ¶¶ 7–9, 166 P.3d at 1288. In holding that the decision to exclude the evidence was an abuse of discretion, and that the error was prejudicial, we noted that

> this Court has indicated that a litigant is usually entitled to a remand and a new trial if he was unfairly restricted in developing and presenting his theory of the case. *Capshaw v. WERCS*, 2001 WY 68, ¶ 10, 28 P.3d 855, 858 (Wyo.2001); *Stauffer Chem. Co. v. Curry*, 778 P.2d 1083, 1100 (Wyo.1989). When the issue is the exclusion of evidence, we generally prefer to allow a party his "day in court" to resolve a controversy on its merits. *Winterholler [v. Zolessi ]*, 989 P.2d [621,] 628 [ (Wyo. 1999) ]. The trial court's rulings unduly restricted the presentation of [the defendant's] theory of his case, and largely denied [the defendant] his day in court, further supporting the conclusion that the error was unfairly prejudicial.

*Id.*, ¶ 21, 166 P.3d at 1291.

[¶ 27] As in *Capshaw* and *Schmid*, the district court's evidentiary rulings in this case prevented Mr. Glenn from presenting a vital part of his theory of the case, which was that the car-checking procedure in effect at the time of Mr. Glenn's accident arose as a direct result of the prior incident, and that the subsequent procedure was *more safe* than the former procedure in light of that incident. Further, as in *Capshaw*, the district court's rulings had the unfortunate ef-

fect of allowing Union Pacific to argue repeatedly that Black Butte was negligent in allowing its employees to inspect train cars on the balloon track, while restraining Mr. Glenn from responding to those arguments with any concrete justification for Black Butte's judgment that the new procedure was safer than its former procedure. Although the district court was legitimately concerned with the danger of unfair prejudice, the court's rulings unduly restricted Mr. Glenn from presenting his theory of the case. Because the excluded evidence was essential to Mr. Glenn's defense against the allegations that Black Butte was negligent, and because it was the jury's prerogative to determine the degree of safety of Black Butte's car-checking procedure, we must conclude that the district court abused its discretion in applying W.R.E. 403.

■ [¶ 28] In holding that the district court abused its discretion in excluding evidence of the prior incident, we repeat the qualification offered in *Capshaw,* where we stated that

> We are not saying the court must allow any and all evidence the parties offer on the subject of mismanagement, but it must allow sufficient, admissible evidence to permit them to argue to the jury that Mr. Capshaw either did or did not have a good faith basis to criticize management. Ultimately, the judge has discretion to control the amount of evidence and the resulting length of the trial. *Hall v. Hall,* 708 P.2d 416, 421 (Wyo.1985).

*Id.,* ¶ 12, 28 P.3d at 858. Likewise, in this case, the district court has discretion to tailor presentation of the evidence to prevent the jury from hearing unnecessary or inflammatory details of the prior incident. Additionally, the dangers of "unfair prejudice" can be addressed through an appropriate limiting instruction. Counsel for Mr. Glenn indicated his amenability to a limiting instruction on several occasions, stating at one point during trial that "We don't have any problems with the Court giving limiting instructions or crafting our presentation of that so as to avoid unnecessary drama, but we think the facts of the case are intimately related to this Cleav Porter incident and that we should be

allowed to tell the jury about it." As we noted in *Capshaw,* managing evidence through proper jury instructions "accommodates the receipt by the trier of fact of all relevant evidence and, at the same time, permits the parties to fully litigate their case theories." *Id.,* ¶ 13, 28 P.3d at 859.

### c. *Prejudicial error*

■ [¶ 29] We must also conclude that exclusion of the prior incident evidence was prejudicial. Mr. Glenn was effectively prevented from defending against argument and inference that Black Butte was at fault for his injury. As Mr. Glenn's employer, Black Butte was immune from suit under Wyoming's Worker's Compensation Act. Wyo. Stat. Ann. § 27–14–104. However, under Wyoming's comparative fault statute, the jury was permitted to allocate fault to actors, including Black Butte, who were not made parties to the action. Wyo. Stat. Ann. § 1–1–109. As a result of this statutory scheme, Mr. Glenn was placed in the position of having to defend against allegations relating to Black Butte's negligence, for any percentage of fault allocated to Black Butte would necessarily diminish his recovery. Absent evidence of the prior incident, however, Mr. Glenn was unable to provide the jury with a clear justification for Black Butte's decision to require its employees to walk the balloon track when checking the train cars. Given that any increase in the allocation of fault to Black Butte had a direct effect on Mr. Glenn's recovery, there is at least a reasonable probability that the verdict would have been different if the error in excluding the evidence had not occurred. Accordingly, we find that the error was prejudicial, and so we reverse and remand for a new trial.

### Issue 2: *Fault Attributable to FMC Astaris*

[¶ 30] Although we reverse based on our resolution of the first issue, we will also consider Mr. Glenn's second issue due to the fact that it is likely to arise again in the new trial. In his second issue, Mr. Glenn contends the district court erred in "permitting the jury to consider the fault of two nonparty actors," referring to Astaris and Black Butte.

This issue, however, which actually consists of two separate arguments, relates only to Astaris. Contrary to Mr. Glenn's issue statement, he does not argue that the jury should not have been allowed to attribute fault to Black Butte. Rather, he contends that the district court erred by (1) finding that Astaris owed him a duty of care, and (2) refusing to instruct the jury on the law of intervening cause as it relates to Astaris. We will address these issues separately.

### a. Duty of care

[¶ 31] Mr. Glenn's first argument is that Astaris did not owe him a duty of care and that, as a result, the district court erred in denying his motion for a directed verdict[3] in favor of Astaris. In his motion, Mr. Glenn argued that Astaris was entitled to judgment as a matter of law because it did not owe a duty of care under contract, statute, or common law. He repeats this argument on appeal. Mr. Glenn also argues that "[t]here is certainly no relationship that would 'impose' on Astaris 'an obligation to act reasonably for the protection' of Glenn." Further, he contends that his injury was not foreseeable to Astaris because "Astaris's conduct occurred nearly four weeks before the injury, over 300 miles away from Black Butte."

[¶ 32] The existence and scope of a duty is a question of law, which we review *de novo*. *Rice v. Collins Commun., Inc.*, 2010 WY 109, ¶¶ 8, 10, 236 P.3d 1009, 1013–14 (Wyo.2010). Further, we review the decision to grant or deny a motion for judgment *de novo*. *Sayer v. Williams*, 962 P.2d 165, 167 (Wyo.1998). However, we view the facts in the light most favorable to the trial court's decision.

A judgment as a matter of law is appropriate when reasonable jurors could reach but one conclusion as to the verdict. We regard the nonmoving party's evidence as being true, and we give that party the benefit of all reasonable inferences that may be drawn from the evidence. Additionally, we do not weigh the evidence or assess the credibility of the witnesses. A judgment as a matter of law deprives the opposing party of the opportunity to have the jury determine the facts, and the court should, therefore, use caution in granting such a judgment.

*Schmid,* ¶ 26, 166 P.3d at 1292.

[¶ 33] As noted above, under Wyoming's comparative fault statute, a non-party actor may be placed on the verdict form if the actor's fault is determined to be a proximate cause of injury. Wyo. Stat. Ann. § 1–1–109 (LexisNexis 2011). The relevant portions of the statute provide as follows:

**§ 1–1–109. Comparative fault.**

(a) As used in this section:

(i) "Actor" means a person or other entity, including the claimant, whose fault is determined to be a proximate cause of the death, injury or damage, whether or not the actor is a party to the litigation;

. . .

(iv) "Fault" includes acts or omissions, determined to be a proximate cause of death or injury to person or property, that are in any measure negligent, or that subject an actor to strict tort or strict products liability, and includes breach of warranty, assumption of risk and misuse or alteration of a product;

. . .

(b) Contributory fault shall not bar a recovery in an action by any claimant or the claimant's legal representative to recover damages for wrongful death or injury to person or property, if the contributory fault of the claimant is not more than fifty percent (50%) of the total fault of all actors. Any damages allowed shall be diminished in proportion to the amount of fault attributed to the claimant.

(c) Whether or not the claimant is free of fault, the court shall:

(i) If a jury trial:

(A) Direct the jury to determine the total amount of damages sustained by the claimant without regard to the percentage of fault attributed to the

---

3. The term directed verdict is now identified as judgment as a matter of law. A motion for a directed verdict is procedurally identical to a motion for judgment as a matter of law under the current W.R.C.P. 50. *Pokorny v. Salas,* 2003 WY 159, ¶ 7 n. 3, 81 P.3d 171, 174 n. 3 (Wyo.2003).

claimant, and the percentage of fault attributable to each actor; and

(B) Inform the jury of the consequences of its determination of the percentage of fault.

(ii) If a trial before the court without jury, make special findings of fact, determining the total amount of damages sustained by the claimant without regard to the percentage of fault attributed to the claimant, and the percentage of fault attributable to each actor.

(d) The court shall reduce the amount of damages determined under subsection (c) of this section in proportion to the percentage of fault attributed to the claimant and enter judgment against each defendant in the amount determined under subsection (e) of this section.

(e) Each defendant is liable only to the extent of that defendant's proportion of the total fault determined under paragraph (c)(i) or (ii) of this section.

*Id.* Because the definition of "fault" includes acts or omissions "that are in any measure negligent," one who seeks to include a nonparty actor on the verdict form must prove that the actor was negligent by showing (1) the actor owed a duty of care to the plaintiff, (2) the actor breached the duty, (3) the actor's breach was the proximate cause of injury or loss to the plaintiff, and (4) the plaintiff suffered actual injury or loss. *See Andersen v. Two Dot Ranch, Inc.,* 2002 WY 105, ¶ 11, 49 P.3d 1011, 1014 (Wyo.2002).

■ [¶ 34] A duty of care "may arise by contract, statute, common law, or when the relationship of the parties is such that the law imposes an obligation on the defendant to act reasonably for the protection of the plaintiff." *Rice,* ¶ 10, 236 P.3d at 1014. We have stated that a duty exists where, "upon the facts in evidence, such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other—or, more simply, whether the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant." *Daniels v. Carpenter,* 2003 WY 11, ¶ 21, 62 P.3d 555, 563 (Wyo.2003). In considering whether a duty exists, we have balanced the following factors to aid in that determination:

(1) the foreseeability of harm to the plaintiff, (2) the closeness of the connection between the defendant's conduct and the injury suffered, (3) the degree of certainty that the plaintiff suffered injury, (4) the moral blame attached to the defendant's conduct, (5) the policy of preventing future harm, (6) the extent of the burden upon the defendant, (7) the consequences to the community and the court system, and (8) the availability, cost and prevalence of insurance for the risk involved.

*Id.* These factors were originally adopted in *Gates v. Richardson,* 719 P.2d 193, 196 (Wyo. 1986) from *Tarasoff v. Regents of Univ. of Cal.,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334, 342 (1976). In *Tarasoff,* the Supreme Court of California recognized the "fundamental principle" that " 'whenever one person is by circumstances placed in such a position with regard to another ... that if he did not use ordinary care and skill in his own conduct ... he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger.' " *Id.* (quoting *Rowland v. Christian,* 69 Cal.2d 108, 70 Cal.Rptr. 97, 443 P.2d 561, 564 (1968)). With regard to the eight-factor test, the *Tarasoff* court held that "[t]he most important of these considerations in establishing duty is foreseeability." *Id.* The primacy of foreseeability in determining whether a duty exists has been echoed by numerous courts and commentators. For example, in *Beugler v. Burlington Northern & Santa Fe Ry.,* 490 F.3d 1224 (10th Cir.2007), the Tenth Circuit Court of Appeals stated that

Many factors inform the duty analysis, but the most important consideration is foreseeability. Generally a defendant owes a duty of care to all persons who are foreseeably endangered by his conduct with respect to all risks which make the conduct unreasonably dangerous. Foreseeability establishes a 'zone of risk,' which is to say that it forms a basis for assessing whether the conduct creates a generalized and foreseeable risk of harming others.

*Id.* at 1228 (quoting *Iglehart v. Bd. of County Comm'rs of Rogers County*, 60 P.3d 497, 502 (Okla.2002)); *see also Henderson v. United States*, 846 F.2d 1233, 1234 (9th Cir.1988); *Winschel v. Brown*, 171 P.3d 142, 146 (Alaska 2007); 57A Am.Jur.2d *Negligence* § 121, at 196 (2004) ("The most important consideration in the determination of whether the defendant owed the plaintiff a duty is whether the defendant was foreseeably endangered by the defendant's conduct.") (footnote omitted).

[¶ 35]  On appeal, both parties have presented a brief analysis of each of the *Gates* factors. Given the relatively straightforward circumstances surrounding Mr. Glenn's injury, however, we find it unnecessary to examine each of the elements in the *Gates* test. Instead, we will focus exclusively on the foreseeability of injury in determining whether Astaris owed a duty to Mr. Glenn.

[¶ 36]  The district court, determining that Mr. Glenn's injury was foreseeable, held as follows:

> Well, my thinking on this is this. I think there is enough evidence in the record to establish foreseeability. I think it's a common sense issue on top of everything. If you have stuff left in [the train car] and it has to be taken out, that it could pose a hazard to somebody or something whether it be a derailment or a person. Then there is this relationship with the parties, which seems to exist based on the testimony of the custom of the industry.

We agree with the district court that the injury to Mr. Glenn was foreseeable. Both the general nature of Mr. Glenn's accident and the evidence presented at trial support a finding that Mr. Glenn's injury was foreseeable. First, it is entirely reasonable to expect that leftover material in an improperly cleaned and closed train car will fall from that train car and cause injury to a person who is ultimately tasked with emptying the car. One needs only a basic familiarity with the law of gravity to anticipate that heavy material precariously perched on an unlocked door may come down with unfortunate consequences. Given the uncomplicated nature of the accident at issue here, we find that Mr. Glenn's injury was reasonably foreseeable.

[¶ 37]  Second, the evidence in the record indicates that Mr. Glenn's injury was foreseeable based on the relationship between Astaris and Black Butte. An Astaris employee testified at trial that Astaris had a responsibility to clean all of the coal out of the train cars. The employee testified that "[a]ny person releasing a car [is] supposed to release it in a safe condition." He also testified that Astaris had received complaints from another company "from time to time" that coking coal was left over in the train cars after leaving Astaris' plant. After the employees of that company went on strike, Astaris requested that Black Butte provide coal for its operation in Don, Idaho. Given that Astaris was aware that leftover material created problems for its shippers, and that it had requested coal from the Black Butte mine, it was reasonably foreseeable that material left in an improperly unloaded car could cause injury to a Black Butte employee. In sum, we hold that the district court did not abuse its discretion in finding that Astaris owed a duty to Mr. Glenn and, accordingly, did not err in denying Mr. Glenn's motion for judgment as a matter of law.

### b.  *Intervening cause instruction*

[¶ 38]  In Mr. Glenn's second argument relating to the fault of Astaris, he contends that "alternatively, the jury was not adequately instructed on the law of causation as it relates to Astaris." More precisely, he argues that the district court erred in refusing to give the jury an intervening cause instruction. He contends that Union Pacific's failure to provide cars that were reasonably safe for their intended purpose cuts off any negligence by Astaris. Mr. Glenn argues that "there is no evidence that Astaris could foresee that the Railroad would repeatedly fail to inspect the car as it was required to do."

[¶ 39]  We review a district court's decision to give or refuse a particular jury instruction for an abuse of discretion. *Pina v. Christensen*, 2009 WY 64, ¶ 8, 206 P.3d 1298, 1300 (Wyo.2009).

When examining the propriety of jury instructions, this Court reviews whether

the instructions, taken as a whole, adequately and clearly advise the jury of the applicable law. The trial court is not obligated to give an instruction offered by a party as long as the jury is adequately instructed on the law as it pertains to that case. The trial court's ruling on an instruction will not constitute reversible error absent a showing of prejudice, and prejudice will not be said to result unless it is demonstrated that the instruction confused or misled the jury with respect to the proper principles of law. *Sellers v. Dooley Oil Transport*, 2001 WY 44, ¶ 9, 22 P.3d 307, 309 (Wyo.2001); *Cervelli v. Graves*, 661 P.2d 1032, 1036 (Wyo.1983). The burden is on the appellant to show prejudicial error. *Daley v. Wenzel*, 2001 WY 80, ¶ 29, 30 P.3d 547, 554–55 (Wyo. 2001). *Parrish v. Groathouse Constr., Inc.*, 2006 WY 33, ¶ 7, 130 P.3d 502, 505 (Wyo.2006).

[¶ 40] As Mr. Glenn's argument suggests, an intervening cause is one that comes into being after a negligent act has occurred, and if it is not a foreseeable event, it will insulate the original actor from liability. *Buckley v. Bell*, 703 P.2d 1089, 1092 (Wyo.1985). An unforeseeable intervening cause is also described as a "superseding cause." *See id.* at 1093; 65 C.J.S. *Negligence*, § 223 (2011). We have stated that the notion of intervening cause is an "alternative method" for explaining the concepts of legal or proximate cause and the "substantial factor" test. *Buckley*, 703 P.2d at 1092. In similar terms, other courts have determined that superseding cause is merely a subset of the inquiry into proximate cause. *Convit v. Wilson*, 980 A.2d 1104, 1125–26 (D.C.2009); *Mobile Gas Service Corp. v. Robinson*, 20 So.3d 770, 780–81 (Ala.2009). Moreover, at least one jurisdiction has concluded that the doctrine of superseding cause "has no place in our modern system of comparative fault and apportionment" because "it is inconsistent to conclude simultaneously that all negligent parties should pay in proportion to their fault ... but that one negligent party does not have to pay its share because its negligence was somehow 'superseded' by a subsequent negligent act." *Barry v. Quality Steel Products, Inc.*, 263 Conn. 424, 441–42, 820 A.2d 258, 269 (2003). The commonality in the analysis of proximate cause and intervening cause, and the mandates of Wyoming's comparative fault statute, may have contributed to the 2009 Pattern Jury Instructions Committee's disapproval of a pattern intervening cause instruction. The committee note accompanying the instruction states that

> The 2009 Committee agreed that a pattern "intervening cause" is not appropriate. The Committee felt that the majority of cases do not call for an "intervening cause" instruction where such matters are addressed through comparative fault instructions. However, the Committee also felt it appropriate to provide practitioners with an example of such an instruction as a "Use Note" for consideration in an appropriate case.

Wyoming Civil Pattern Jury Instruction No. 3.12, Use Note (2009).

[¶ 41] The district court, after initially reserving judgment on the intervening cause instruction, in order to give the issue further study, subsequently determined that the instruction should not be given. The court cited the Committee's note as one among several reasons for its decision to deny the requested instruction:

> I will not give an intervening cause instruction. I did some research about foreseeability and other elements of that doctrine. I am not giving it for four reasons. First of all, because of the testimony and inferences from that testimony regarding custom and practice in the railroad and mining industry. Second, because of the jury instruction committee's fractured position on the issue. Third, because I think it would be confusing to the jury. And fourth, because I think the jury is being adequately instructed on comparative fault, causation and foreseeability, among other things, and I think it gives you the basis to argue whatever you want to argue regarding those issues. So that instruction will not be given.

Ultimately, the court gave the following instructions relating to comparative fault and causation:

> Instruction No. 15

In this case it is claimed that Black Butte Coal Company and Astaris were at fault in the June 30, 2000 incident in question. Even though these two companies have not appeared or offered evidence, it is necessary that you determine whether Black Butte Coal Company or Astaris was at fault in the June 30, 2000 incident in question and determine the percentage of fault, if any, attributable to each of these two companies. For purposes of these instructions, Black Butte Coal Company and Astaris will hereafter be referred to as non-parties.

Instruction No. 31

Your verdict in this case must be determined on the basis of the comparative fault of the parties and the non-parties at fault.

. . .

It will be necessary for you to determine the comparative fault, if any, of each of the parties involved in the occurrence and the non-parties at fault. It also will be necessary for you to determine the total amount of damages, if any, sustained by the plaintiff.

Your findings as to fault will affect the plaintiff's recovery. It is my duty to explain how that may occur.

The defendant's liability for damages is limited to the percentage of fault, if any, that you find is attributable to the defendant.

The plaintiff's recovery is reduced by the percentage, if any, of fault that you find is attributable to the plaintiff and the non-parties at fault. If you find that the plaintiff's fault exceeds fifty percent (50%), the plaintiff will not be entitled to recover any damages.

. . .

Instruction No. 17

The negligence, if any, of the defendant and the non-parties is not a "cause" of any injuries to the plaintiff unless injury to a person in the plaintiff's situation was a reasonably foreseeable consequence of that negligence. The exact or precise injury need not have been foreseeable, but the defendant or the non-parties may be found to be a "cause" of the plaintiff's

harm within the meaning of these instructions if a reasonably careful person, under similar or the same circumstances as the defendant or the non-parties, would have anticipated that injury to a person in the plaintiff's situation might result from the defendant's conduct.

Instruction No. 18

If more than one act or failure to act contributed to the claimed injury, then each act or failure to act may have been a "cause" of the injury within the meaning of these instructions. A cause does not have to be the only cause or the last or nearest cause. It is sufficient if the act or failure to act joins in a natural and probable way with some other act or failure to act to cause some or all of the claimed injury.

Instruction No. 23

An injury or damage is caused by an act, or a failure to act, whenever it appears from the evidence that the act or omission played a substantial part in bringing about the injury or damage.

We find that these instructions adequately address the issues of causation and comparative fault. In the final analysis, the same facts that supported Mr. Glenn's argument for an intervening cause instruction also allowed him to argue that Astaris' comparative fault was minimal in relation to the other actors in this case. In light of the rule that "[t]rial courts are afforded substantial latitude to tailor the instructions to the facts of the case," we hold that the district court did not abuse its discretion in refusing to give an intervening cause instruction. *See, e.g., Budder v. State,* 2010 WY 123, ¶ 7, 238 P.3d 575, 577 (Wyo.2010).

*Issue 3: Cumulative Error*

[¶ 42] Finally, because we reverse based on the district court's exclusion of the prior incident at the Black Butte facility, we do not address Mr. Glenn's contention that we should remand on the basis of cumulative error.

[¶ 43] Reversed and remanded for a new trial.